SUSAN E. LOGGANS AND ASSOCIATES, Petitioner-Appellant, v. ESTATE OF MARVIN MAGID, Deceased, Respondent-Appellee.

First District (6th Division)   No. 1—90—2164

Opinion filed January 17, 1992.—Rehearing denied March 18, 1992.

Esposito & Heuel, of Chicago (Terence M. Heuel, Paul R. Karasik, and Bruce A. Slivnick, of counsel), for appellant.

Kenneth C. Miller, Ltd., of Chicago (Kenneth C. Miller, of counsel), for appellee.

JUSTICE LaPORTA delivered the opinion of the court:

This dispute involves the division of attorney fees. Susan E. Loggans & Associates was hired by the executor of Marvin Magid's estate after Magid was killed in a helicopter crash on March 29, 1987. The Loggans firm was hired on a one-third contingency basis to prosecute the estate's claim for damages arising out of the helicopter crash. The Loggans firm was eventually fired, and Kenneth C. Miller was hired to pursue the suit. The case was settled for $3.9 million, and the trial court approved $1.3 million in attorney fees. The Loggans firm filed a fee petition, seeking a portion of the $1.3 million in addition to the $33,333.33 it had already been paid by the estate for an earlier settlement with one defendant. The trial court denied the petition for additional fees. Loggans appeals.

On appeal we consider: (1) whether the trial court committed reversible error in making numerous evidentiary rulings during the course of the hearing which prejudiced the petitioner by unduly restricting its ability to prove its entitlement to reasonable attorney fees; (2) whether the trial court's refusal to award the petitioner any fees whatsoever beyond the amount previously earned under its contingency fee contract was an abuse of the trial court's discretion; and (3) whether this court should reverse or modify the decision in *Johns v. Klecan* (1990), 198 Ill. App. 3d 1013, 556 N.E.2d 689, to allow for a comparison/apportionment evaluation of the attorney fees portion of the client's recovery in appropriate circumstances.

Marvin Magid was killed in a helicopter crash in Hawaii on March 29, 1987. The executor of the estate, Jerome Magid, hired Susan E. Loggans & Associates (hereinafter Loggans or the firm) to file a wrongful death suit against the owners of the Hawaii helicopter company and certain other Hawaii companies. The estate and Loggans signed a contract for Loggans to be paid on a contingency fee basis of one-third of any monies recovered.

A 15-count complaint was filed April 2, 1987, against Kona Helicopters Inc., Kona Village F & B Corporation and Bell Helicopters Textron in the circuit court of Cook County. Twelve counts in the complaint were filed on behalf of Magid's estate and its beneficiaries. Three counts sought loss of services for Lettuce Entertain You Enterprises, Inc., JAO Inc., and Gabe's Place Inc., corporations for which Magid was a shareholder and performed services.

Defendants removed the case to Federal court based on diversity of citizenship. Defendants then filed a motion to dismiss for lack of personal jurisdiction. Loggans was given leave and filed a 29-count amended complaint in Federal court here. The complaint added two additional defendants, Kona Operating Partnership, d/b/a Kona Village Resort, and Associated Inns & Restaurants Company of America, d/b/a Kona Village Resort. The amended complaint also sought damages for Magid's wife, Marie, who sustained injuries in the helicopter crash.

The Federal court granted defendant's motion to dismiss for lack of personal jurisdiction in February of 1988. Six months later, on August 1, 1988, Loggans filed a complaint in the United States District Court in Hawaii. On August 3 Loggans was fired and Kenneth Miller was hired by the executor of the estate and Marie Magid. Loggans remained the attorney for Lettuce Entertain You Enterprises, Inc., JAO Inc., Gabe's Place and two other passengers in the helicopter. The record is silent as to the status of the litigation on behalf of these remaining plaintiffs.

On December 21, 1989, Miller settled the case for $3.9 million on behalf of estate and $600,000 for Marie Magid. Loggans sought a portion of the one-third share, $1.3 million, that represented fees to the attorney for the estate. The trial court ordered that $650,000 of the $1.3 million be set aside in an interest-bearing account until the fee dispute involving Loggans was resolved.

The trial court conducted a hearing to determine whether Loggans was entitled to fees from the estate beyond the $33,333.33 it had received out of a $100,000 settlement with Bell Helicopters Textron. Two former Loggans associates, Mary Sweeney and Michael Bledsoe, and the firm's sole owner, Susan E. Loggans, testified about time spent and the work they did on the case.

Bledsoe testified that he worked at Loggans for five months in 1987 and during that time he spent an entire day preparing a draft of the original complaint and spent time preparing a motion to spread Magid's death of record, a summons of service and an emergency protective order and in reviewing and revising pleadings according to Loggans' directions.

Sweeney testified that after fees became an issue in the case and under Loggans' order she prepared a summary of the time spent on the case by all people in the Loggans office. She testified that the time sheet was a thorough and accurate account of the work done on behalf of all plaintiffs, which included the estate and four other plaintiffs. She testified that she personally spent seven hours review-

ing the file the day she was assigned the case, June 15, 1987. She testified that she did substantial work on the case over the next few weeks, including preparing an amended complaint and other pleadings, appearing in court, researching issues as to damages and investigating the plane crash.

Loggans testified that she worked with Hawaii officials and aviation officials to get details of the crash investigation and arranged to have Magid's body returned to Chicago. She testified that she helped prepare the original complaint and protective order and did research on the pleadings to determine whether there was a good-faith basis for filing the lawsuit in Cook County. She testified she made phone calls on the case and periodically made a complete review of the file and prepared a list of things "to do" on the case.

Loggans testified that she had a diary, now unavailable, of hours she worked on the case and had used that diary to add her time to the time log already prepared by Sweeney. She stated that her individual time sheet information was lost when her company computer malfunctioned but that she could determine the hours she worked by "editing" out the time estimates prepared by Sweeney from the time sheet that included Sweeney's hours and the hours she had prepared and fed into the computer. The trial court refused to permit her during her testimony to do the editing she requested.

After hearing the rest of the testimony, the trial court denied Loggans' request for additional fees. In an 18-page ruling, the trial court noted that Loggans was unable to produce any time records shortly after being fired when asked to do so by the estate's new attorney. The court noted that Sweeney constructed a time log which she told the court was a "time estimate" of all the work performed by the firm on the estate's behalf. The court stated that "the only individual capable of testifying in this court's opinion as to the actual time spent for the awarding of fees in *quantum meruit* in response to this petition for fees would be the witness attorney Sweeney."

"In Loggans['] petition for fees (Exhibit D) a statement of Loggans time log was filed. From the examination of witness Sweeney who had prepared petitioner's Exhibit No. 3, when questioned as to why there were variations in the logs stated that when she accurately prepared the proper log and submitted the same to Loggans, she was informed that Loggans believed that the amount of time that Sweeney had accounted for was 'inadequate.' When questioned further as to what was meant by the word inadequate, witness Sweeney could not understand what Loggans meant by that, how-

ever, Sweeney's testimony before this court was that the summary of time was accurate based on a reconstruction that she was able to do from the entire file. The only inadequacy that Sweeney could possibly be aware of is to what extent Loggans might have engaged in activities after the Magid file was taken away from Sweeney."

The court reviewed Loggans' testimony, noting that Loggans had no independent recollection of time spent but had offered evidence that her time was at one time recorded on her diary now unavailable.

The court reasoned: "After hearing all the testimony of both witnesses as far as the time logs are concerned this court finds that the total hours spent on the Magid file from the date of hiring by the executor until the time of discharge directly attributable to this estate would be 181 hours. 181 hours times $200 is $36,200. This, however, was for work representing 5 plaintiffs. The petitioner has already received $33,333.33 which was the result of the 1/3 settlement of the $100,000 in the Bell Helicopter settlement in the U.S. District Court. It is the opinion of the court that although on a *quantum meruit* basis Loggans' firm was overpaid, but as long as the contingency contract provided for a receipt of one-third of whatever there was received from the settlement that Loggans['] firm is entitled to the full $33,333.33 already paid."

Several factors must be considered to determine what fee is properly due to an attorney fired by a client. A contract between the parties provides guidelines, but in all cases, contingent or hourly fee cases, only those fees which are reasonable charges for reasonable services will be allowed. (*Kaiser v. MEPC American Properties, Inc.* (1987), 164 Ill. App. 3d 978, 983, 518 N.E.2d 424.) The determination of the reasonableness of the fees is left to the sound discretion of the trial judge and will not be reversed absent an abuse of discretion. *Kaiser*, 164 Ill. App. 3d at 983-84.

The *Kaiser* case involved the fee dispute of two parties who signed an hourly fee contract. The court stated that in such cases the attorney seeking fees must present detailed records maintained during the course of the firm's work that contain facts and computation upon which the charges are based. The fee petition must specify the services performed, by whom they were performed, the time expended and the hourly rate charged. *Kaiser*, 164 Ill. App. 3d at 984.

■ When a contingency fee contract is signed and the lawyer involved is fired, such as occurred here, the attorney is entitled to recovery on a *quantum meruit* theory for the reasonable value of his services performed up to the time of his discharge. *Rhoades v. Nor-*

*folk & Western Ry. Co.* (1979), 78 Ill. 2d 217, 399 N.E.2d 969; *In re Estate of Murphy* (1978), 56 Ill. App. 3d 1037, 1040, 372 N.E.2d 878.

In *Johns v. Klecan* (1990), 198 Ill. App. 3d 1013, 556 N.E.2d 689, this court distinguished between the records and proof that must be produced in a contingency fee contract case and the records and proof required in an hourly fee case such as existed in *Kaiser*. The court in *Johns* stated:

> "We see no reason why *** the policy considerations which justify limiting the recovery of legal fees after discharge to a *quantum meruit* recovery also necessarily support or require extending to contingency fee cases the rule established in *Kaiser* that no recovery of reasonable hourly fees is allowed pursuant to a contract unless the attorneys present detailed time records. The only policy consideration which, arguably, does so is the concern for the possibility of excessive fees. However, we believe that trial courts can adequately guard against that possibility without requiring that contingent fee attorneys account for the time they spend on a case with the same specificity and exactitude of hourly fee attorneys.
>
> *** Since the time and labor required is but one factor in the *quantum meruit* equation, we do not believe that the failure to account for the time spent on a case in exacting detail should, alone, preclude any recovery of fees. At most, that failure militates in favor of a reduced fee." *Johns*, 198 Ill. App. 3d at 1019.

Other factors to be considered are the attorney's skill and standing, the nature of the cause, the novelty and difficulty of the subject matter, the degree of responsibility in managing the cause, the usual and customary charge in the community and the benefits resulting to the client. *Johns*, 198 Ill. App. 3d at 1019.

The trial court's finding will not be disturbed unless it is against the manifest weight of the evidence, because the trier of fact, especially where the testimony is in conflict, is in the best position to observe the conduct of the witnesses and weigh the evidence. *Schulenburg v. Signatrol, Inc.* (1967), 37 Ill. 2d 352, 356, 226 N.E.2d 624.

First we consider whether the trial court committed reversible error in its evidentiary rulings during the course of the hearing which prejudiced the petitioner by unduly restricting its ability to prove its entitlement to reasonable attorney fees.

Loggans offers evidence of four instances in the fee petition hearing where it contends the trial court ruled improperly, thereby

limiting the firm's opportunity to explain the amount of time it spent on the Magid case. First, the trial court granted the estate's motion to strike portions of Bledsoe's testimony because Bledsoe could not testify to the exact amount of time he spent preparing various pleadings on the case. The trial judge sustained an objection as to Bledsoe's inexactness, stating: "The objection is sustained. I am not trying to circumvent any attorney[s] from getting paid for their work, but in order to find out how much they are entitled to, I have to know what they did, how much time they spent and on what they did it."

Bledsoe testified without objection to time he spent on some court appearances and drafting other documents. Other times the court struck his testimony because it was not specific enough. During Bledsoe's testimony, the court asked Bledsoe if he was guessing at the time estimates he was giving. Bledsoe answered that he had no independent memory and was guessing based on his notes. The court noted, "These are all guesstimates, okay."

■ We do not find Bledsoe's testimony was unduly restricted. He was permitted to testify generally about the work he performed including the pleadings he filed despite a clear indication from him that he was providing only "guesstimates."

Loggans alleges a second error occurred when the court refused to hear testimony from the counsel for several of the Hawaii defendants, Donald Sime, who allegedly would have testified that he made a settlement offer of $2.2 million that was rejected by the estate. The court refused to permit the testimony, stating it found an offer of settlement had no probative value to the fee petition. Loggans contended that evidence of the settlement provided the court with proof that the estate benefited from the firm's work despite cross-examination of Bledsoe which seemed to indicate some pleadings he filed and arguments he pursued may have damaged the estate's case. The firm argues that the offer is proof the defendants had acknowledged their liability by the time Miller took over the case and that his only task was seeking an enhancement of the amount.

The estate urges that the trial court had adequate evidence before it and an error in the exclusion or admission of evidence does not warrant reversal when no prejudice results because other evidence supports the results reached. (*Cole v. Guy* (1989), 183 Ill. App. 3d 768, 539 N.E.2d 436.) Where the result is supported by other evidence in the case, the claim of erroneous evidentiary rulings will not warrant reversal. *Atkins v. Thapedi* (1988), 166 Ill. App. 3d 471, 519 N.E.2d 1073.

The estate also cites *In re Estate of Murphy* (1978), 56 Ill. App. 3d 1037, 1040, 372 N.E.2d 878, for the proposition that rejected settlement offers cannot be used as the basis to determine a fee for a fired attorney. In *Murphy,* a fired law firm, hired on a 25% contingent fee, tried to collect a fee based on 25% of a $4,000 offer made to but then rejected by the client. The appellate court reversed the $1,000 award of attorney fees and held that *quantum meruit* and not the contingent fee contract should be the basis for the firm's compensation. *Murphy,* 56 Ill. App. 3d at 1040.

■ The estate is correct that the *Murphy* case prohibits fee determinations based on rejected settlement offers. But the *Johns* case specifically indicates that a fee determination based on *quantum meruit* also must consider the benefits resulting to the client. The record establishes that shortly after he was hired Miller acknowledged to the trial judge that a $2.2 million offer had been rejected by plaintiffs. Though Loggans should have been given an opportunity to show that this $2.2 million offer through Sime's testimony was evidence of a benefit to the client, we find that this evidence was before the court by Miller's acknowledgement already when the court ruled and therefore the error was harmless.

The third error cited by Loggans involved the testimony of the firm's sole owner, Susan Loggans. The firm contends Loggans should have been permitted to use a document prepared by Sweeney to refresh her recollection as to the amount of time she, Loggans, spent on various projects during the course of litigation. Loggans testified that she asked Sweeney to prepare a composite of all the time spent on the case by everyone in the firm after fees became an issue. Sweeney testified that she prepared the document by reviewing the file and estimating the hours spent on the case based on her memory. Sweeney testified that the document included all work done on the case with the possible exception of time Loggans might have spent on the case after Sweeney stopped working on the file.

Loggans then testified that she prepared her own personal time summary and had that summary merged with Sweeney's time summary on the company computer. She testified that problems with her office computer resulted in the loss of her personal time log and that, therefore, she needed to compare Sweeney's time summary with the merged time summary to determine which entries on the merged document represented the time she worked.

The trial court refused to permit Loggans to compare the two sheets, indicating that the parties had entered into a stipulation from the onset that Loggans could use only the merged time sum-

mary which merged together her hours and the log of hours prepared by Sweeney.

■ Under evidentiary rules, Loggans should have been able to use anything to refresh her recollection. A witness may testify by referring to a memorandum, even though it may not be admitted or admissible into evidence, by stating the facts that he then recalls and need not have personally prepared the memorandum. *People v. DeMario* (1969), 112 Ill. App. 2d 175, 251 N.E.2d 267, *cert denied* (1970), 397 U.S. 1057, 25 L. Ed. 2d 675, 90 S. Ct. 1404.

We find this error by the trial court harmless, however. Loggans was able to testify to various projects she participated in, research she performed, calls she made and file reviews she did. Her estimate of her hours along with the hours compiled by Sweeney were combined in exhibit D attached to the fee petition. The trial court had the merged time summary statement of the firm's work on the case before it even if Loggans was not able to testify to each individual entry.

Finally, the firm argues that the court erred when it struck Loggans' testimony that she spent "approximately" four to five hours a day on research during a four-day period in April 1987. The trial court sustained an objection made by the estate's counsel because the testimony as to time was not specific enough and ordered the firm's attorney to move on to another line of questioning.

The firm argues that in rejecting Loggans' testimony as to the time she spent on the case, the trial court improperly required Loggans and her associates to be too specific as to time, place and subject matter. Loggans contends that this limitation was improper under the standard established in *Johns v. Klecan* and resulted in the court obtaining an insufficient amount of evidence on the type of work done by the firm. The firm contends that the trial court's refusal to accept clearly relevant evidence is reversible error which mandates a new hearing. *McCaffrey v. Illinois Central Gulf R.R. Co.* (1979), 71 Ill. App. 3d 42, 49, 388 N.E.2d 1062.

■ We find the court's ruling appropriate with regard to Loggans' approximations. In his ruling the trial judge noted that Loggans testified she had no independent recollection of the time spent. The court did permit Loggans to testify that she did research and worked with her staff. While it is true that the trial court struck great portions of Loggans' testimony, the record indicates that the court permitted testimony that went beyond the exact time and subject matter of work performed whenever Loggans' counsel laid the proper foundation.

Sweeney was able to freely testify about the time she spent on the case and even the time other workers spent on the case once Loggans' counsel laid the foundation to establish that she had worked on the case, reviewed the file and then put together an estimated time log based on the file contents. The trial court did strike testimony that involved some estimates and guesstimates and restricted some testimony to actual recall of the days, hours and work done. But this occurred only after both Loggans and Bledsoe testified that they had no independent recollection generally of dates and hours spent on the case.

In contingent fee cases, attorneys might not keep time records in as detailed a manner as those who must bill by the hour. Here, the court permitted Loggans to put forth a reconstruction of hours as prepared by Sweeney and permitted Sweeney to testify about work done on the case. The court also permitted Loggans and Bledsoe to testify despite their lack of recollection about specific time worked. All three were able to testify to specific tasks on which they recalled working.

We find that the trial court properly relied on the standard articulated in *Johns v. Klecan*. The court should have permitted the firm to offer evidence that a $2.2 million offer was made but rejected by the estate while Loggans was its counsel, but failure to permit such testimony was harmless error where the successor counsel acknowledged the rejected offer in open court. The court committed harmless error when it refused to permit Loggans to look at the document she requested to refresh her recollection. The court did not unduly restrict Bledsoe's and Loggans' testimony after they indicated they had no independent recall of time spent on the case. We conclude that the trial court did not commit reversible error in its evidentiary rulings during the course of the hearing which prejudiced the petitioner by unduly restricting its ability to prove its entitlement to reasonable attorney fees.

Next we consider whether the trial court's refusal to award the petitioner any fees whatsoever beyond the amount previously earned under its contingency fee contract was an abuse of the trial court's discretion.

Loggans contends that the trial court failed to follow the dictates of *Johns v. Klecan* when it considered only evidence of the firm's time and services involved. The firm contends that other factors should have been considered such as the attorney's skill and standing, the nature of the cause, the novelty and difficulty of the subject matter, the degree of responsibility in managing the cause,

the usual and customary charge in the community and the benefits resulting to the client. *Johns*, 198 Ill. App. 3d at 1019.

The firm argues that the trial court failed to consider much of Loggans' and Bledsoe's testimony, that Loggans herself had handled more than 100 plane crashes and was chairperson for a number of bar association groups related to aviation law, that the firm accepted the case on a contingent fee basis, the complexity of the case, and the firm's work that benefited the estate, including obtaining an offer of $2.2 million from a group of Hawaii defendants.

The firm also argues, in its reply brief, that the $33,333.33 settlement paid during the contingent contract period as a result of the Bell Helicopters Textron settlement was a separate transaction for which the firm was rightfully paid. Loggans argues that the portion of the contract with regard to Bell Helicopter was completed at that time and is not at issue here. The firm argues that it has the right to collect additional fees on a *quantum meruit* basis based on work it performed with regard to the action pending against other defendants. To award nothing, the firm argues, would result in Loggans being paid nothing on its *quantum meruit* claim.

■ We reject this last-minute suggestion that the $33,333.33 payment should be considered a separate and distinct benefit of the contingency contract and should not have been considered by the trial judge. Not only is this a belated argument by the firm raised for the first time on appeal and therefore waived, but it is not supported by case law and does not reflect that the settlement was reached in July 1988, just a short time before Loggans was fired. In addition, the record provides insufficient evidence to separate work between this defendant and the others to apportion the work among her clients.

In the firm's petition for fees, Loggans suggested three different methods of calculating fees all of which would resulted in fees due of at least $603,300. The three methods were: first, *quantum meruit*, where the firm would be paid $603,300; second, a *pro rata* apportionment between Loggans and Miller for $833,000 to Loggans based on the actual amount recovered, the work done and a comparison of services to the ultimate recovery; and third, a "fee ratio" calculation that would pay the firm a fee of $17 million based on a formula that took into consideration a purported $2.5 million offer to plaintiffs and how much Miller earned compared to how much the plaintiffs were actually paid. The latter two methods were not pursued on appeal.

The firm contended that using the *quantum meruit* method, based on 502.75 hours logged by the firm, the court should permit payment to Loggans of $603,300, a figure which we note works out to $1,200 per hour. Loggans derived this figure from what it referred to as the firm's "real effective hourly rate of return."

Finally, Loggans argues that nothing in the record indicates that the successor attorney, Kenneth Miller, had to correct any defective work done by the Loggans firm. Loggans contends that this fact goes to the *quantum meruit* question of whether the firm's work benefitted the client.

The estate disputes all of the firm's contentions, most specifically with regard to the Loggans firm's skill and whether the estate benefited from its representation. The trial court specifically found the estate did not receive any benefit outside of a possible benefit from the settlement with Bell Helicopters Textron. The estate identified several actions taken by the firm which the court found to be detrimental to the estate's interests. Among them are the firm's improper attempt to litigate in Illinois when the proper venue was Hawaii; improperly identifying defendants and plaintiffs; the Bell settlement, which under Hawaii law could have permitted other defendants to shift responsibility to the settled defendant; the attempt to appoint a guardian *ad litem* to evaluate a nonexistent settlement offer; and the filing of a court document that disclosed a settlement offer which implied plaintiff's willingness to accept the offer.

The estate argues that the court recognized that the firm failed to take "even one liability deposition" and did not obtain records on the repair and maintenance of the helicopter involved in the crash. The estate further disputed the firm's contention that it had superior "skill and standing" in the legal community and had performed work on complex legal issues.

The estate argues that the trial court had the duty to weigh the credibility of the witnesses, Loggans, Sweeney and Bledsoe, and weigh the value of the time logs prepared "after the fact." It argues that the accuracy of entries in the time logs was put into question when comparing the Sweeney time log with the merged time log including Loggans' additional hours. The estate specifically identified two-hour time blocks logged only as "total review of file" which appear nearly every week from April 1987 through late 1988. An entry even exists on August 4, 1987, the day after the stipulated date of discharge. As an example, the estate notes that the time log indicated four, two-hour reviews of the file in March of 1988 at a time

when the only file activity was five letters either written or received.

The estate argues that the trial court also was aware that the "after-the-fact time" logs were not made available to the estate on request but only appeared at the time of the fee petition hearing. The estate argues that the court found incredible Loggans' contention that she had used various personal diaries and records to compute her time, including a computer generated list, all of which were subsequently unavailable.

The estate urges that it is not the job of the reviewing court to reweigh the evidence. (*Zaderaka v. Illinois Human Rights Comm'n* (1989), 131 Ill. 2d 172, 545 N.E.2d 684.) The trial court's finding will not be disturbed unless it is against the manifest weight of the evidence (*Schulenburg*, 37 Ill. 2d at 356).

■■ We find the trial court had substantial relevant information before it and reviewed that information under the standards established in *Johns v. Klecan*. The firm acknowledges that Loggans testified as to her skill and standing in the community and her usual fees. The court heard evidence on the extent to which each party believed the firm's work benefited the client. Loggans presented no evidence of the usual and customary charge in the community or evidence of research the firm did on novel or difficult subject matters. The trial judge clearly explained his reasons for finding inadequacies with the work the firm did for the estate. Though the trial judge erred in not accepting evidence about the $2.2 million rejected settlement offer, we do not find that action to be reversible error in light of the trial court's other findings of inadequacy on the part of the Loggans firm. We hold that the trial court's ruling was not against the manifest weight of the evidence.

Finally, Loggans urges this court to "modify" the court's holding in *Johns v. Klecan* and establish a new method to determine what fees should be paid to a fired attorney who contracted with a client on a contingent fee basis. The firm contends that fees should be apportioned by comparing the percentage of work done by the fired attorney with the percentage of work done by the successor attorney. Loggans then advocates that the percentages then should be applied to the total attorney fees earned and paid out accordingly to the respective attorneys.

The firm argues that this method gives proper consideration to the "contingent nature of the fee involved." The firm argues that this would eliminate a potential problem under *quantum meruit* where a fired attorney has put in so many hours that his payment

due actually exceeds the amount of the contingent fee which the client would have had to pay. The firm contends that the trial court was in error when it failed to compare work done by Loggans with work done by Miller.

In support of its argument, Loggans cites a California case, *Cazares v. Saenz* (1989), 208 Cal. App. 3d 279, 256 Cal. Rptr. 209, where the court apportioned fees between two law firms involved in a case. One firm handled the case from start to finish and at one point had brought the second firm in to help. When a lead partner in the second firm joined the bench and had to withdraw from the case, the first firm refused further help from other members of the judge's firm and finished the work itself. The trial court awarded the judge's former firm half the fees. The appeals court determined the appropriate fees by deciding what percent of the work each firm did and then applying that fraction to the total contingent fee paid. The court reasoned that a fractional approach to determining fees permitted each firm to be paid its *pro rata* share of the contract price.

Loggans argues that this court should rely on the *Cazares* case, which the firm contends "presents a compelling rationale for the 'comparison/apportionment' approach rejected by the court in *Johns*."

The estate notes initially that the trial court considered this argument from the firm and then rejected it. The estate also argues that Loggans failed to introduce evidence of the amount of work Miller performed as compared to the work Loggans performed at the fee petition hearing. The firm now contends the trial court ignored such evidence.

■ We note that the trial court rejected the apportionment theory and stated that even if such a theory was applied here to determine the fees, the firm would not be entitled to more fees than it had already been paid.

The trial court devoted the final 5 pages of its 18-page opinion to a two-part analysis of first, whether *Johns v. Klecan* was applicable, and second, how much the firm would be due and owing under a comparison/apportionment analysis. The court reviewed the language in *Johns* and found that *Johns* was the appropriate precedent to follow. The *Johns* court stated:

> "Determining the amount of total time spent on cases in performing legitimate services for the client and then multiplying that time by a reasonable hourly rate, as in *Ashby*, is, we believe, the best method to determine the reasonable value of a

discharged attorney's services. That approach avoids the problems inherent in the comparison/apportionment approach of cases such as *Phelps v. Elgin, Joliet & Eastern Ry. Co.* (1966), 70 Ill. App. 2d 89, 217 N.E.2d 519, and *Baker v. Granite City* (1983), 112 Ill. App. 3d 1096, 446 N.E.2d 531. It is much easier for a trial court to undertake the *Ashby* approach than to place a value on the perhaps widely varying services performed by attorneys *vis-a-vis* the client's ultimate recovery." *Johns*, 198 Ill. App. 3d at 1021.

The trial court then proceeded to explain its finding that work done by Loggans would not warrant additional fees even if a comparison/apportionment method was used. The court detailed several inadequacies it found in the Loggans firm's services to the estate including identifying parties improperly in court documents, failing to gather evidence of the helicopter's previous maintenance and repairs records, failure to perform any depositions, disclosing a potential settlement offer in a court document, filing the lawsuit in the wrong venue and accepting a partial settlement with a Hawaii defendant at the risk of limiting recovery from other defendants under the laws of Hawaii, the situs of the accident.

We affirm the trial court in its conclusion that even if a comparison/apportionment method of calculation was used, Loggans would be due no more than the $33,333.33 it has already been paid. We find the *Phelps* decision cited in *Johns* is factually distinguishable and therefore inapplicable because it involved a lawyer who unsuccessfully sought fees when he was discharged the day after he was hired and had done no work for the client. (*Phelps*, 70 Ill. App. 2d at 96.) The court determined that the *Phelps* lawyer need not be paid under those facts and did not apply a theoretical comparison/apportionment analysis as Loggans would urge us to do.

The *Baker v. Granite City* case referred to in the *Johns* decision was remanded and then appealed two more times, most recently in 1989. (*Baker v. City of Granite City* (1989), 198 Ill. App. 3d 119, 544 N.E.2d 1310.) Both *Baker II* and *Baker III* discuss using a percentage figure, and *Baker II* held that "the usual and customary attorney fee in the community can be expressed as a percentage." *Baker*, 189 Ill. App. 3d at 120.

*Baker II* describes the factual background. Plaintiff Mary Baker Davis was working for lawyer Richard Allen when she fell on a city sidewalk and received permanent injuries. Allen represented Baker in a personal injury case for three years before the two realized they had a difference of opinion on what compensation Allen was to be

paid. The dispute was not resolved but Allen continued to represent Baker and two years later a jury awarded Baker $125,000. Allen then asked Baker to sign a contingent agreement where he would get 33⅓% of the gross amount recovered or 40% if the money was recovered after an appeal. Baker refused to agree and wrote a letter to Allen firing him as her attorney. However, based on advice from the Illinois State Bar Association general counsel, Allen continued to represent plaintiff and filed an appellate brief on her behalf. Baker hired another lawyer who also represented her on the appeal, which she won.

At a subsequent fee hearing, the trial court ruled that Allen was entitled to compensation which could be computed either on a percentage basis or by a fixed hourly rate. The court awarded Allen 40% of plaintiff's total recovery, *i.e.*, 33⅓% for the trial work and 6⅔% for the appellate work. When the case was appealed the second time in *Baker II*, the appeals court held that the trial court had properly awarded attorney fees, concluding that after considering those factors necessary to determine a reasonable fee, the usual and customary attorney fee in the community can be expressed as a percentage. The court used a percentage figure of 33⅓% of plaintiff's recovery for the trial work because that was the customary fee for personal injury cases in that community, and remanded the case to the circuit court for a redetermination of Allen's appellate court fees. *Baker II*, 112 Ill. App. 3d 1096.

In *Baker III* the court upheld an award of 5% of plaintiff's recovery for the work her former lawyer did for her on her appeal. The court found no abuse of discretion when the trial court determined that 6⅔% percent was the usual and customary appellate fee paid and that Allen should be paid 5%. *Baker III*, 189 Ill. App. 3d at 123.

*Baker* is factually distinguishable from our case. First we note that the *Baker* court only considered fees due Allen compared to the percentage of fees usually and customarily paid for appellate work. This is not a comparison/apportionment division of fees between two attorneys such as Loggans urges should be applied to this case. In addition, Allen represented Baker through trial and won a jury verdict of $125,000. In this case no trial was had and Loggans had settled with only one defendant at the time it was fired while the litigation still was pending.

The Loggans analysis is premised on the false perception that two law firms worked on the estate's case and now the court must decide who is to be paid how much. We do not believe that is an ac-

curate picture. Loggans was hired in April 1987 and settled with the Bell Helicopter defendant in July 1988. Loggans was fired by the estate on August 3, 1988. Its representation of the estate's interest ceased 16 months before the wrongful death action in Hawaii was resolved on December 21, 1989. The record includes two letters, one dated October 6, 1988, and one November 1, 1988, where Loggans was asked to supply a log of the time it worked on the case so that the firm could be paid. Loggans responded that it could not produce such a time record and waited until more than a year later, after the case was settled, to petition for its fees in the case.

In the *Cazares* case relied on by Loggans, the client involved never fired any of the attorneys in the case. It was instead a matter of one firm choosing to do the bulk of the legal work and preventing the other from participating. Here, Loggans was discharged from the case. Under *Johns*, a fired attorney still has a right to collect a fee but the fee is based on work actually done and not on the contingent contract.

This case more closely resembles the facts in *In re Estate of Murphy* (1978), 56 Ill. App. 3d 1037, 1040, 372 N.E.2d 878, where a fired law firm, originally hired on a 25% contingent fee basis, tried to collect a fee based on 25% of a $4,000 offer made to but then rejected by the client. The appeals court reversed the $1,000 award of attorney fees and held that *quantum meruit* and not the contingent fee contract should be the basis for the firm's compensation. *Murphy*, 56 Ill. App. 3d at 1040.

We believe the application of *quantum meruit* as articulated in *Johns* is the most appropriate and efficient method of determining attorney fees for a fired lawyer. The Loggans firm's protracted arguments on appeal over who did what for the client and how it benefited the client are perhaps the best example of the difficulties inherent in a comparison/apportionment method of fee determination where a discharged attorney is replaced by a successor attorney who then takes the litigation to a successful completion. We affirm the trial court's finding that the *Johns* case governs here and that application of a comparison/apportionment method of fee determination is inappropriate.

For the foregoing reasons, we affirm the ruling of the trial court awarding the Loggans firm no additional attorney fees.

Affirmed.

EGAN, P.J., and McNAMARA, J., concur.